AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| a Digital Device in the custody of the Federal Bureau of Investigation at Los Angeles, California, as described in Attachment A | ) ) ) ) |

Case No. 2:21-MJ-02598

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2251 (d) | Advertisement of Child Pornography |
| 18 U.S.C. § 2252 (a) (2) | Receipt and Distribution of Child Pornography |
| 18 U.S.C. § 2252A (a) (5) (B) | Possession of Child Pornography |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ *Elizabeth Farrell*

*Applicant's signature*

**ELIZABETH FARRELL, SPECIAL AGENT, FBI**

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

*Judge's signature*

City and state: <u>Los Angeles, CA</u>

*Printed name and title*

AUSA: <u>Michael J. Morse – x7367</u>

**ATTACHMENT A**

**DEVICE TO BE SEARCHED**

The following digital device (the "SUBJECT DEVICE"), seized on January 20, 2021 and currently maintained in the custody of Federal Bureau of Investigations, Los Angeles, California: A T-Mobile Aristo 4+, IMEI 352375110095676, (714) 248-8712.

**ATTACHMENT B**

ITEMS TO BE SEIZED

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 2252A(a)(2) (receipt and distribution of child pornography) and 2252A(a)(5)(B) (possession of child pornography), namely:

a.   Child pornography, as defined in Title 18, United States Code, Section 2256(8).

b.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer to child pornography, as defined in Title 18, United States Code, Section 2256(8), including but not limited to documents that refer to the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography.

c.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, tending to identify persons involved in the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, in interstate

commerce, including by computer, involving any visual depiction of a minor engaged in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

       d.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, tending to identify PORTWOOD as the owner or a user of the SUBJECT DEVICE.

       e.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer or relate to any production, receipt, shipment, order, request, trade, purchase, or transaction of any kind involving the transmission through interstate commerce by any means, including by computer, of any visual depiction of a minor engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

       f.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that identify any minor visually depicted while engaging in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

       g.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that discuss, depict, or evidence any minor engaging in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

h.   Any and all records, documents, programs, applications, messages, notes, materials, or items that are sexually arousing to individuals who are interested in minors, but which are not in and of themselves obscene or which do not necessarily depict minors involved in sexually explicit conduct. Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques of child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings.

i.   Any records, documents, programs, applications, or materials identifying possible minor victims depicted in child pornography and/or minor victims of sexual abuse.

j.   Any and all records, documents, programs, applications, notes, materials, or items, including electronic mail and electronic messages, which discuss or otherwise may be related to the sexual exploitation of children.

k.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, which pertain to peer-to-peer file sharing software.

l.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that pertain to accounts with any Internet Service Provider.

m.    Any phone book, call log, or call records, digital or otherwise.

n.    Records, documents, programs, applications, materials, and files relating to the deletion, uploading, and/or acquisition of victim files to include photographs, videos, e-mails, chat logs, or other files.

o.    Records, documents, programs, applications, materials, and files relating to the online social media accounts of any victim.

p.    Any digital device used to facilitate the above-listed violations and forensic copies thereof.

q.    With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software,

iv

as well as evidence of the presence or absence of security
software designed to detect malicious software;

        iii. evidence of the attachment of other devices;

        iv.  evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

        v.   evidence of the times the device was used;

        vi.  passwords, encryption keys, and other access
devices that may be necessary to access the device;

        vii. applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

        viii.    records of or information about
Internet Protocol addresses used by the device;

        ix.  records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

    2.   As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,

modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

**SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or

seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.  The search team may use forensic examination

and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques, including to search for known images of child pornography.

c.    The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.    If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.    If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data and may access such data at any time.

f.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

6.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

x

## <u>AFFIDAVIT</u>

I, Elizabeth C. Farrell, being duly sworn, declare and state as follows:

## I. <u>PURPOSE OF AFFIDAVIT</u>

1.    This affidavit is made in support of an application for a warrant to search the following digital device:  A T-Mobile Aristo 4+ smartphone, International Mobile Equipment Identity ("IMEI") 352375110095676, using phone number (714) 248-8712, (the "SUBJECT DEVICE"), which is currently maintained in the custody of the Federal Bureau of Investigations ("FBI") at Los Angeles, California, as described more fully in Attachment A.

2.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 2251(d) (advertisement of child pornography), 2252A(a)(2) (receipt and distribution of child pornography), and 2252A(a)(5)(B) (possession of child pornography), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all

conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

4.    I am a Special Agent ("SA") with the FBI and have been so employed since October 2005.  I am currently assigned to a Violent Crimes Against Children squad in the Los Angeles Field Office.  In that capacity, I investigate the sexual exploitation of children and child pornography, in violation of 18 U.S.C. §§ 2252(a) and 2252A, as part of the Southern California Regional Sexual Assault Felony Enforcement ("SAFE") Team. During my tenure as an SA, I have conducted and participated in numerous investigations of criminal activity, including investigations of criminal enterprises, white collar crime, child exploitation, and child pornography.  During these investigations, I have participated in the execution of numerous search and arrest warrants and seized evidence of violations of United States law.

5.    I have gained expertise in child exploitation investigations through formal and on-the-job training and received training and experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, surveillance, and a variety of other investigative tools available to law enforcement officers.  In addition, I received specialized training in the sexual exploitation of children, observed and reviewed images of child pornography in many forms of media, including computer and digital media, and participated in numerous interviews and debriefings of persons

involved in the sexual exploitation of children.  I have
conducted and participated in numerous investigations related to
the sexual exploitation of children, which have resulted in the
arrest and conviction of individuals.

6.    Through my training and experience, I have become
familiar with methods used by people who commit offenses
involving the sexual exploitation of children.  My training and
experience have given me an understanding of how people who
commit offenses related to the sexual exploitation of children
use the internet and digital devices to facilitate and commit
those offenses.

### III.  BACKGROUND ON CHILD EXPLOITATION OFFENSES, COMPUTERS, THE INTERNET, AND DEFINITION OF TERMS

7.    In this affidavit, the terms "minor," "sexually
explicit conduct," "visual depiction," "producing," and "child
pornography" are defined as set forth in 18 U.S.C. § 2256.  The
term "computer" is defined as set forth in 18 U.S.C.
§ 1030(e)(1).

8.    Based upon my training and experience in the
investigation of child pornography, and information related to
me by other law enforcement officers involved in the
investigation of child pornography, I know the following
information about the use of computers with child pornography:

a.    Computers and Child Pornography.  Computers and
computer technology have revolutionized the way in which child
pornography is produced, distributed, and utilized.  Child
pornographers can now produce both still and moving images

directly from a common video camera and can convert these images
into computer-readable formats.  The use of digital technology
has enabled child pornographers to electronically receive,
distribute, and possess large numbers of child exploitation
images and videos with other Internet users worldwide.

        b.    File Storage.  Computer users can choose their
method of storing files: either on a computer's hard drive, an
external hard drive, a memory card, a USB thumb drive, a smart
phone or other digital media device, etc. (i.e., "locally") or
on virtual servers accessible from any digital device with an
Internet connection (i.e., "cloud storage").  Computer users
frequently transfer files from one location to another, such as
from a phone to a computer or from cloud storage to an external
hard drive.  Computer users also often create "backup," or
duplicate, copies of their files.  In this way, digital child
pornography is extremely mobile and such digital files are
easily reproduced and transported.  For example, with the click
of a button, images and videos containing child pornography can
be put onto external hard drives small enough to fit onto a
keychain.  Just as easily, these files can be copied onto
compact disks and/or stored on mobile digital devices, such as
smart phones and tablets.  Furthermore, even if the actual child
pornography files are stored on a "cloud," files stored in this
manner can only be accessed via a digital device.  Therefore,
viewing this child pornography would require a computer,
smartphone, tablet, or some other digital device that allows the
user to access and view files on the Internet.

c.   <u>Internet</u>.   The term "Internet" is defined as the worldwide network of computers -- a noncommercial, self-governing network devoted mostly to communication and research with roughly 500 million users worldwide.   The Internet is not an online service and has no real central hub.   It is a collection of tens of thousands of computer networks, online services, and single user components.   In order to access the Internet, an individual computer user must use an access provider, such as a university, employer, or commercial Internet Service Provider ("ISP"), which operates a host computer with direct access to the Internet.

d.   <u>Internet Service Providers</u>.   Individuals and businesses obtain access to the Internet through ISPs.   ISPs provide their customers with access to the Internet using telephone or other telecommunications lines; provide Internet e-mail accounts that allow users to communicate with other Internet users by sending and receiving electronic messages through the ISPs' servers; remotely store electronic files on their customer's behalf; and may provide other services unique to each particular ISP.   ISPs maintain records pertaining to the individuals or businesses that have subscriber accounts with them.   Those records often include identifying and billing information, account access information in the form of log files, e-mail transaction information, posting information, account application information, and other information both in computer data and written record format.

e.   IP Addresses.   An Internet Protocol address ("IP Address") is a unique numeric address used to connect to the Internet.   An IPv4 IP Address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). In simple terms, one computer in a home may connect directly to the Internet with an IP Address assigned by an ISP.   What is now more typical is that one home may connect to the Internet using multiple digital devices simultaneously, including laptops, tablets, smart phones, smart televisions, and gaming systems, by way of example.   Because the home subscriber typically only has one Internet connection and is only assigned one IP Address at a time by their ISP, multiple devices in a home are connected to the Internet via a router or hub.   Internet activity from every device attached to the router or hub is utilizing the same external IP Address assigned by the ISP.   The router or hub "routes" Internet traffic so that it reaches the proper device. Most ISPs control a range of IP Addresses.   The IP Address for a user may be relatively static, meaning it is assigned to the same subscriber for long periods of time, or dynamic, meaning that the IP Address is only assigned for the duration of that online session.   Most ISPs maintain records of which subscriber was assigned which IP Address during an online session.

f.   IP Address – IPv6.   Due to the limited number of available IPv4 IP addresses, a new protocol was established using the hexadecimal system to increase the number of unique IP addresses.   An IPv6 consists of eight sets of combination of

four numbers 0-9 and/or letters A through F.  An example of an
IPv6 IP address is 2001:0db8:0000:0000:0000:ff00:0042:8329.

       g.    The following definitions:

         i.    "Chat," as used herein, refers to any kind
of text communication over the Internet that is transmitted in
real-time from sender to receiver. Chat messages are generally
short in order to enable other participants to respond quickly
and in a format that resembles an oral conversation. This
feature distinguishes chatting from other text-based online
communications such as Internet forums and email.

        ii.    "Chat room," as used herein, refers to the
ability of individuals to meet in one location on the Internet
in order to communicate electronically in real-time to other
individuals. Individuals may also have the ability to transmit
links to electronic files to other individuals within the chat
room.

        iii. "Child erotica," as used herein, means
materials or items that are sexually arousing to persons having
a sexual interest in minors but that are not necessarily obscene
or do not necessarily depict minors engaging in sexually
explicit conduct.

        iv.   "Child pornography," as defined in 18 U.S.C.
§ 2256(8), is any visual depiction, including any photograph,
film, video, picture, or computer or computer-generated image or
picture, whether made or produced by electronic, mechanical or
other means, of sexually explicit conduct, where: (a) the
production of the visual depiction involved the use of a minor

engaged in sexually explicit conduct; (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

v. "Cloud-based storage," as used herein, is a form of digital data storage in which the digital data is stored on remote servers hosted by a third party (as opposed to, for example, on a user's computer or other local storage device) and is made available to users over a network, typically the Internet. Users of such a service can share links and associated passwords to their stored files with other traders of child pornography in order to grant access to their collections. Such services allow individuals to easily access these files through a wide variety of electronic devices such as desktop and laptop computers, mobile phones, and tablets, anywhere and at any time. An individual with the password to a file stored on a cloud-based service does not need to be a user of the service to access the file. Access is typically free and readily available to anyone who has an Internet connection.

vi. "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, other

mobile phones, and other mobile devices. *See* 18 U.S.C.
§ 1030(e)(1).

        vii. "Computer software," as used herein, is
digital information which can be interpreted by a computer and
any of its related components to direct the way they work.
Computer software is stored in electronic, magnetic, or other
digital form. It commonly includes programs to run operating
systems, applications, and utilities.

        viii.   "File Transfer Protocol" ("FTP"), as
used herein, is a standard network protocol used to transfer
computer files from one host to another over a computer network,
such as the Internet. FTP is built on client-server architecture
and uses separate control and data connections between the
client and the server.

        ix. "Encryption" is the process of converting
data into a code in order to prevent unauthorized access to the
data.

        x.  "Log files" are records automatically
produced by computer programs to document electronic events that
occur on computers. Computer programs can record a wide range of
events including remote access, file transfers, logon/logoff
times, and system errors. Logs are often named based on the
types of information they contain. For example, web logs contain
specific information about when a website was accessed by remote
computers; access logs list specific information about when a
computer was accessed from a remote location; and file transfer

logs list detailed information concerning files that are remotely transferred.

xi.  "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

xii. "Mobile applications," as used herein, are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, reading a book, or playing a.

xiii.    "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

xiv. "Remote computing service," as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

xv.  "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

xvi. A "storage medium" or "storage device" is any physical object upon which computer data can be recorded.

Examples include hard disks, RAM, floppy disks, "thumb," "jump,"
or "flash" drives, CD-ROMs, and other magnetic or optical media

          xvii.    U.S.C. § 2256(5), includes undeveloped
film and videotape, data stored on computer disc or other
electronic means which is capable of conversion into a visual
image, and data which is capable of conversion into a visual
image that has been transmitted by any means, whether or not
stored in a permanent format.

          xviii.    A "Website" consists of textual pages
of information and associated graphic images. The textual
information is stored in a specific format known as Hyper-Text
Mark-up Language (HTML) and is transmitted from web servers to
various web clients via Hyper-Text Transport Protocol (HTTP).

## IV. SUMMARY OF PROBABLE CAUSE

    7.   On January 25, 2010, WILLIAM PORTWOOD ("PORTWOOD") was
sentenced to a 121-month term of imprisonment followed by a
lifetime period of supervised release for his conviction of
Distribution of Child Pornography, in violation of 18 U.S.C. §
2252A(a)(2). (See Dkt. 99, Case No. 07-CR-00212-AB-1.)  After
being released in 2016, PORTWOOD began his term of supervised
release.  On March 29, 2019, PORTWOOD was found in violation of
the terms of supervised release after he viewed adult
pornography (in violation of the rules of his sex offender
treatment program), and possessed an unauthorized cell phone.
The sentencing court imposed an 18-month custodial sentence as a
result of PORTWOOD's violations.

8.   On March 22, 2020, while PORTWOOD was residing at a United States Bureau of Prisons ("BOP") reentry facility as part of his sentence for the supervised release violation, a BOP staff member witnessed PORTWOOD using another cell phone, the SUBJECT DEVICE, in violation of BOP rules.

9.   BOP personnel seized the SUBJECT DEVICE and found evidence that PORTWOOD viewed pornography on it.  Specifically, BOP personnel found web browser viewing and search history consistent with child sex abuse material[1] ("CSAM").  On March 23, 2020, at a BOP disciplinary hearing, PORTWOOD admitted to possessing the cell phone in violation of BOP rules.  On June 16, 2020, PORTWOOD was released from BOP custody, and resumed his lifetime term of supervised release.

10.   On December 15, 2020, the United States Office of Probation and Pretrial Services ("USPPS") filed a supervised release violation petition against PORTWOOD, alleging that he possessed and distributed child pornography, using a smart phone (which was a different device from the SUBJECT DEVICE), between October and November of 2020.  PORTWOOD later admitted to those violations, which, again, did not include allegations related to the SUBJECT DEVICE.

11.   In January of 2021, during the FBI's investigation of PORTWOOD's alleged violations, I learned of the existence of the

---

[1] BOP personnel reviewed PORTWOOD's web browsing history and found that PORTWOOD visited sites such as "gayhookupaffairs.com," "doggyboys.com," "89.vc," and "Xvideos.com."  According to his web browser history on "Xvideos," PORTWOOD viewed videos titled "Sex in the army," "boy cum in mouth," and "little teen fucked in the gym."

SUBJECT DEVICE, and retrieved the SUBJECT DEVICE from BOP
personnel.  To my knowledge, the SUBJECT DEVICE has never been
forensically analyzed for CSAM material, aside from BOP
personnel's initial examination.  Because the SUBJECT device was
seized from PORTWOOD while he was in BOP custody, it is
contraband.  Thus, FBI cannot return it to PORTWOOD, and has
stored it in FBI custody in Los Angeles, California.  The FBI
now seeks to search the SUBJECT DEVICE because it believes it
will contain evidence of the Subject Offenses.

## V.  STATEMENT OF PROBABLE CAUSE

### A.  PORTWOOD Was Federally Convicted of Distributing Child Pornography and Sentenced to Lifetime Supervised Release

12.  Based on my review of documents filed in the Central
District of California, reports created by USPPS, BOP, and other
law enforcement officers, I learned the following:

13.  On February 27, 2007, based on undercover
investigation, FBI Los Angeles began interacting with the user
of a GoogleHello account (using screen name "Weeyum"), who was
later identified as WILLLIAM D. PORTWOOD of Phoenix, Arizona.
During the course of the undercover interactions, which lasted
from February 15, 2007 through February 21, 2007, PORTWOOD sent
approximately 150-200 images of child pornography to an
undercover FBI agent.  PORTWOOD also expressed an interest in
traveling to Los Angeles, California, for the purpose of having
illicit sexual contact with a minor.

14.  During these conversations, PORTWOOD claimed to have
molested both his daughter and his niece.  However, the

image he sent of his purported daughter was that of a matched child pornographic image of a known victim with the National Center for Missing and Exploited Children ("NCMEC"), and the two images he sent of his purported niece appeared to be different girls.

15. On March 9, 2007, the government filed a complaint in the Central District of California charging PORTWOOD with violations of 18 U.S.C. § 2252A(a)(2), Distribution of Child Pornography, based on the above-referenced activity.

16. On March 13, 2007, FBI Phoenix conducted a Mirandized interview of PORTWOOD. During the interview, PORTWOOD admitted to distributing child pornography online. PORTWOOD admitted to sending images of children as young as two or three and as old as eighteen. PORTWOOD denied molesting or physically touching any minor in a sexual manner. PORTWOOD denied having a daughter. PORTWOOD was subsequently arrested.

17. On March 23, 2007, the government filed an indictment in the Central District of California charging PORTWOOD with two counts of 18 U.S.C. § 2252A(a)(2)(A), Distribution of Child Pornography, in case number 07-CR-00212. (Dkt. 6.)

18. On December 3, 2008, PORTWOOD pleaded guilty via written plea agreement to both counts of the indictment. (Dkt. 72.)

19. On January 25, 2010, the Honorable Judge Audrey B. Collins sentenced PORTWOOD to 121 months' imprisonment, with a life term of supervised release to follow. (Dkt. 99.)

20.  On October 4, 2016, the sentencing court modified PORTWOOD's supervised release conditions to include residency at a residential reentry center ("RRC") for a period not to exceed one year due to PORTWOODS's inability to secure suitable housing.

**B.  PORTWOOD Repeatedly Violated His Term of Supervised Release and Possessed Multiple Unauthorized Cell Phones**

21.  On or about October 17, 2016, PORTWOOD began his life term of supervised release.

1.  Modification of Supervised Release and First Revocation Proceedings

22.  On December 1, 2016, the sentencing court modified the conditions of supervised release for the second time, due to PORTWOOD's termination from the RRC program.  Specifically, PORTWOOD had been terminated from the RRC program for being in possession of an unauthorized cell phone (a different cell phone from the SUBJECT DEVICE).  The sentencing court ordered PORTWOOD to complete a home detention program for a period of up to 365 days.

23.  On January 26, 2017, the sentencing court issued a bench warrant for PORTWOOD based on ten new supervised release violations.  The violations included unauthorized possession of an access device; associating with felons without authorization; failing to register as a sex offender with local law enforcement; and failing to report for sex offender, mental health, and substance abuse treatment as directed.

24.  On March 20, 2017, the sentencing court revoked PORTWOOD's supervised release and sentenced him to ten months in BOP custody.

25.  On November 8, 2017, the sentencing court again modified conditions of supervised release and placed PORTWOOD in an RRC program due to his unstable housing status.

        2.    <u>The Second Revocation Proceedings</u>

26.  On or about December 4, 2017, PORTWOOD began his second term of supervised release.

27.  On or about January 31, 2019, the sentencing court issued another bench warrant for PORTWOOD related to violations of supervised release for possession of unauthorized access device(s) and unauthorized association with known felons.

28.  On February 26, 2019, USPPS filed an amended petition alleging that PORTWOOD had viewed adult pornography, in violation of the rules of his sex offender treatment program.

29.  On or about March 29, 2019, PORTWOOD admitted to all alleged violations, including unauthorized use of an access device (a different device from the SUBJECT DEVICE), and viewing adult pornography.  The sentencing court revoked supervised release and sentenced PORTWOOD to an 18-month custodial sentence followed by a lifetime term of supervised release.

        3.    <u>The Discovery of the SUBJECT DEVICE in PORTWOOD's Possession at a BOP Reentry Facility</u>

30.  I have reviewed reports related to PORTWOOD's use of the SUBJECT DEVICE, provided to me by BOP.  According to a BOP incident report, on March 22, 2020, an RRC Security Monitor saw

16

PORTWOOD using an unauthorized smartphone.  Once confronted,
PORTWOOD surrendered the phone as instructed.

31.   On March 23, 2020, an Employment Placement Specialist
("EPS") at the RRC facility asked PORTWOOD for the passcode to
the smartphone and he complied.  The EPS conducted a phone
inspection and discovered PORTWOOD had logged in to various
online dating applications, such as "Growlr," "Grizzly," and
"Scruff."  PORTWOOD appeared to have engaged in explicit sexual
conversation with multiple users.  The EPS reviewed PORTWOOD's
web browsing history and found that PORTWOOD visited
pornographic sites such as "gayhookupaffairs.com,"
"doggyboys.com," "89.vc," and "Xvideos.com."

32.   There were also indications that PORTWOOD had used the
SUBJECT DEVICE to view, or attempt to view, child pornographic
or erotica material.  Specifically, according to his web browser
history on "Xvideos," PORTWOOD also viewed videos titled "boy
cum in mouth" and "little teen fucked in the gym."

33.   On March 23, 2020, at a BOP disciplinary hearing,
PORTWOOD admitted to being in possession of an unauthorized
device.  PORTWOOD was found guilty of being in possession of an
unauthorized smartphone, which contained sexually explicit
content.  (PORTWOOD was never found to have violated his
supervised release conditions based on the SUBJECT DEVICE,
because he was in BOP custody, rather than being released on
supervised release).

4.   The Third Revocation Proceedings

34.   On or about June 16, 2020, PORTWOOD was released from custody on his prior violation, and his third term of supervised release began.

35.   On December 15, 2020, USPPO filed a violation petition alleging that between October 22 and November 30, 2020, PORTWOOD again violated terms of supervised release by using an unmonitored internet enabled device (a different device from the SUBJECT DEVICE), and failing to install computer monitoring software as directed by his probation officer.  Further violations alleged included PORTWOOD's use of numerous unauthorized applications on his smartphone (WhatsApp, Kik, Wickr Me), and the distribution and receipt of child pornography from that device.

36.   On November 30, 2020, the USPPO confiscated and forensically examined PORTWOOD's smartphone,.  The digital forensic exam revealed that PORTWOOD had been in possession of, distributed, and received child pornography.

37.   On March 26, 2021, PORTWOOD admitted to all violations contained in the petition and the sentencing court again revoked his supervised release.  PORTWOOD was committed to the custody of BOP for 18 months.

**C.   FBI's Investigation of PORTWOOD's Possession and Distribution of Child Pornography, and Retrieval of the SUBJECT DEVICE from BOP**

38.   As mentioned above, on March 26, 2021, PORTWOOD's term of supervised release was revoked for a third time due to the previously mentioned violations.  The FBI was also alerted to

18

those allegations and began investigating PORTWOOD.  During that investigation, I retrieved the smartphone that was the basis of the violation report (a different smartphone from the SUBJECT DEVICE).  The FBI's forensic analysis of that smartphone found approximately ten files that appeared to be possible CSAM.  The FBI was able to determine that PORTWOOD sent at least three files and received at least two files depicting child pornography.

39.  In January 2021, during that same investigation, I learned of the existence of the SUBJECT DEVICE.

40.  On January 20, 2021, I met with Orion RRC Director Sandi Loper to take possession of the SUBJECT DEVICE, which PORTWOOD had been using on March 22, 2020, at the BOP RRC facility.  Since that time, the SUBJECT DEVICE has been maintained as evidence in FBI Los Angeles Evidence Control Center.  To my knowledge, this phone has not been forensically exploited for a digital review.

41.  Based on my training and experience, and knowledge of PORTWOOD's activities, I believe there is probable cause that the SUBJECT DEVICE contains evidence of the SUBJECT OFFENSES.  Specifically, on at least two occasions (including his conviction and prior violations), PORTWOOD has used digital devices such as the SUBJECT DEVICE to view and/or distribute child pornography.  Indeed, one of PORTWOOD's violations occurred just months after the discovery of SUBJECT DEVICE.

42.  Further, the initial search of the SUBJECT DEVICE contained indications that PORTWOOD was using it to search for

child erotica or pornography; specifically, among the search
terms found from a website that PORTWOOD had accessed included:
"boy cum in mouth" and "little teen fucked in the gym."  Based
on these factors, it is likely that PORTWOOD was using the
SUBJECT DEVICE to search for, access, and/or distribute child
pornography.

## VI. TRAINING & EXPERIENCE ON INDIVIDUALS WITH A SEXUAL INTEREST IN CHILDREN AND USE OF DIGITAL PORNOGRAPHY

43. Based on my training and experience, and the training
and experience of other law enforcement officers with whom I
have had discussions, I have learned that individuals who view
and possess multiple images of child pornography are often
individuals who have a sexual interest in children and in images
of children, and that there are certain characteristics common
to such individuals:

a.   Individuals who have a sexual interest in
children or images of children may receive sexual gratification,
stimulation, and satisfaction from contact with children; or
from fantasies they may have viewing children engaged in sexual
activity or in sexually suggestive poses, such as in person, in
photographs, or in other visual media, or from literature
describing such activity.

b.   Individuals who have a sexual interest in
children or images of children may collect sexually explicit or
suggestive materials in a variety of media, including
photographs, magazines, motion pictures, videotapes, books,
slides, and/or drawings or other visual media.  This includes

collecting images or videos traded with other like-minded individuals through online messaging applications. Individuals who have a sexual interest in children or images of children oftentimes transfer, maintain, and store such materials, and use them for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

        c.   Individuals who have a sexual interest in children or images of children sometimes possess hard copies of child pornography, such as pictures, films, video tapes, magazines, negatives, photographs, and etcetera. As digital technology has developed, individuals with a sexual interest in children or images of children have become much more likely to maintain child pornography, including materials they may have obtained from, or shared with, other individuals through chat and file-sharing applications in digital or electronic format, stored either on digital devices or in remote storage locations on the Internet. Regardless of whether these individuals collect their child pornography in hard copy or digital format, they may maintain their child pornography for a long period of time, even years. They usually maintain these collections in a safe, secure, and private environment, such as their homes, vehicles, or nearby, so they can view the child pornography at their leisure. These collections are typically highly valued.

        d.   Individuals with a sexual interest in children correspond with and/or meet others to share information and

materials (including through digital distribution via the Internet); conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography. Additionally, individuals who receive or share child pornography with other online users often keep backups and copies of those materials on other digital or storage devices.

e.   Individuals who have a sexual interest in children or images of children prefer not to be without their child pornography for any prolonged time period.  This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

21.   Digital child pornography on a digital device is easy to maintain for long periods of time.  Modern digital devices often have extremely large storage capacities.  Furthermore, cheap and readily available storage devices, such as thumb drives, external hard drives, and compact discs make it simple for individuals with a sexual interest in children to download child pornography from the Internet and save it – simply and securely – so it can be accessed or viewed indefinitely.

22.   Furthermore, even if a person deleted any images of child pornography that may have been possessed or distributed, there is still probable cause to believe that there will be evidence of the illegal activities – that is, the possession, receipt, and/or distribution of child pornography – on the SUBJECT DEVICE.

23.   Based on my training and experience, as well as my
conversations with digital forensic experts, I know that
remnants of such files can be recovered months or years after
they have been deleted from a computer device.  Evidence that
child pornography files were downloaded and viewed can also be
recovered, even after the files themselves have been deleted,
using forensic tools.  Because remnants of the possession,
distribution, and viewing of child pornography is recoverable
after long periods of time, searching the SUBJECT DEVICE could
lead to evidence of the child exploitation offenses.

### VII.  <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

24.   As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and

security devices.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that:

a.  Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b.  Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.  The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of a digital device, without the aid of special computer programs and equipment.  A

24

single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 500 or more gigabytes are now commonplace.  Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

       d.   Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.[2] Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack

---

     [2] These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file.  Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.  Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.  Recovery also can require substantial time.

        e.   Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

26

programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly able to be segregated from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use.  Computer file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

27

f.   Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not able to be segregated from the digital device.  Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

g.   Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, digital device users can conceal

28

data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.  In addition, decryption of devices and data stored thereon is a constantly evolving field, and law enforcement agencies continuously develop or acquire new methods of decryption, even for devices or data that cannot currently be decrypted.

25.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII.    CONCLUSION

26.  Based on the foregoing, there is probable cause to believe that the evidence, fruits and instrumentalities of violations of 18 U.S.C. §§ 2252A(a)(2) (receipt and distribution of child pornography) and 2252A(a)(5) (possession of child pornography), as described above and in Attachments B, will be found in a search of the SUBJECT DEVICE, as described in Attachment A of this affidavit.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of May
2021.

_____
UNITED STATES MAGISTRATE JUDGE